﻿Citation Nr: 19159007
Decision Date: 07/30/19 Archive Date: 07/30/19

DOCKET NO. 15-30 770
DATE: July 30, 2019

ORDER

The request to reopen the claim of service connection for diabetes mellitus, type II is granted.

Service connection for diabetes mellitus, type II is granted.

REMANDED

Entitlement to service connection for bilateral plantar fasciitis is remanded.

Entitlement to service connection for liver disease, to include as secondary to exposure to herbicides and service-connected diabetes is remanded.

Entitlement to an initial compensable evaluation for asbestosis is remanded.

Entitlement to an initial compensable evaluation for a residual gluteal cleft scar prior to February 22, 2016, and in excess of 10 percent thereafter is remanded.

FINDINGS OF FACT

1. A November 2006 rating decision denied service connection for diabetes mellitus, type II on the basis that there was no nexus to service. The Veteran did not appeal the decision and he did not submit additional evidence within a year after the decision; therefore, the decision is final.

2. Since the November 2006 rating decision, the Veteran submitted statements which assert he was also exposed to herbicides while serving at Naval Communication Stations located in Guam. He also submitted copies of articles, research, and legislative documents that indicate herbicides may have been stored and/or used in Guam during the time that he served there. This evidence is relevant and probative as to the issue of service connection for diabetes as it provides additional details as to exposure to herbicides in service which were not of record at the time of the prior denial.

3. Resolving reasonable doubt in the Veteran’s favor, his diabetes was due to in-service exposure to herbicides while serving as a radioman at the Naval Communications Station at Andersen Air force Base, Guam.

CONCLUSIONS OF LAW

1. The November 2006 rating decision is final. 38 U.S.C. § 7105 (2012); 38 C.F.R. §§ 20.302, 20.1103 (2018).

2. The evidence received since the November 2006 rating decision, which denied service connection for diabetes, is new and material, and the claim is reopened. 38 U.S.C. §§ 5108, 7105 (2012); 38 C.F.R. § 3.156 (2018).

3. The criteria for entitlement to service connection for diabetes mellitus, type II have been met. 38 U.S.C. §§ 1110, 1116, 1131, 5107 (2012); 38 C.F.R. §§ 3.303, 3.307, 3.309 (2018).

REASONS AND BASES FOR FINDING AND CONCLUSION

The Veteran served on active duty from April 1970 to November 1979.

This matter comes before the Board of Veterans’ Appeals (Board) on appeal from January 2014, December 2014, and March 2016 rating decisions by the Department of Veterans Affairs (VA). In December 2018, the Veteran testified at a Board hearing before the undersigned Veterans Law Judge; a transcript of that hearing is of record.

As noted above, the request to reopen the claim for service connection for diabetes mellitus has been granted. Therefore, the Board will proceed with the adjudication of the issue on the merits below.

Service connection for diabetes mellitus, type II is granted.

The Veteran contends that his diabetes was caused by exposure to herbicides while stationed at the Naval Communications Station on Guam from 1974 to 1977. He asserts that he was stationed at the “Receiver Site.” This facility was an area of about one square mile or so of antenna fields with a small concrete and steel building in the middle, just to the left and below Andersen Air Force Base under the runways used in the bombing strikes on Vietnam. The U.S. Air Force sprayed Agent Orange on the runways, antennas, and the perimeter fences. He spent three years at the receiver site and never left. See April 2016 statement; May 2016 Form 9; December 2018 hearing transcript.

Service connection may be established on a direct basis for a disability resulting from disease or injury incurred in or aggravated by active service. 38 C.F.R. §§ 1110, 1131; 38 C.F.R. § 3.303. Service connection may also be granted for any disease diagnosed after service when all the evidence establishes that the disease was incurred in service. 38 C.F.R. § 3.303(d). In general, service connection requires (1) evidence of a current disability; (2) medical evidence, or in certain circumstances lay evidence, of in-service incurrence or aggravation of a disease or injury; and (3) evidence of a nexus between the claimed in-service disease or injury and the current disability. See Shedden v. Principi, 381 F.3d 1163, 1167 (Fed. Cir. 2004).

Service connection for certain chronic diseases, including diabetes, may be established based upon a legal presumption by showing that the disease manifested itself to a degree of 10 percent disabling or more within one year from the date of discharge from service. 38 U.S.C. §§ 1112, 1137; 38 C.F.R. §§ 3.307(a)(3), 3.309(a).

Under certain circumstances, service connection for specific diseases, including type 2 diabetes mellitus, may be presumed if a veteran was exposed during service to certain herbicides, including those containing dioxin. 38 U.S.C. § 1116; 38 C.F.R. §§ 3.307, 3.309(e). The relevant herbicide agents are those used in support of operations in Vietnam, specifically: 2,4-D; 2,4,5-T and its contaminant TCDD; cacodylic acid; and picloram. 38 C.F.R. § 3.307(a)(6). If a veteran was exposed to such an herbicide agent during service, service connection for type 2 diabetes will be presumed if the diabetes becomes manifest to a degree of 10 percent disabling at any time after service. 38 C.F.R. §§ 3.307(a)(6)(ii), 3.309(e). 

The Board must assess the credibility and weight of all the evidence, including the medical evidence, to determine its probative value, accounting for evidence which it finds to be persuasive or unpersuasive, and providing reasons for rejecting any evidence favorable to the claimant. See Masors v. Derwinski, 2 Vet. App. 181 (1992); Wilson v. Derwinski, 2 Vet. App. 614, 618 (1992); Hatlestad v. Derwinski, 1 Vet. App. 164 (1991); Gilbert v. Derwinski, 1 Vet. App. 49 (1990). Equal weight is not accorded to each piece of evidence contained in the record; every item of evidence does not have the same probative value. When there is an approximate balance of positive and negative evidence regarding any issue material to the determination of a claim, VA shall give the benefit of the doubt to the claimant. 38 U.S.C. § 5107. To deny a claim on its merits, the evidence must preponderate against the claim. See Alemany v. Brown, 9 Vet. App. 518, 519 (1996), citing Gilbert, 1 Vet. App. at 54.

The Veteran contends that he has diabetes mellitus which developed as a result of exposure to Agent Orange. In this regard, the Board notes that a veteran who served on active duty in the Republic of Vietnam during the period from January 9, 1962, to May 7, 1975, shall be presumed to have been exposed during that service to an herbicide agent, unless there is affirmative evidence to establish that the veteran was not exposed to herbicides during service. 38 C.F.R. § 3.307 (a)(6)(iii). While the Veteran asserts he did occasional missions for communication purposes to Vietnam from 1970 to 1973 and participated in Operation End Sweep while aboard the USS Henderson (the demining of Haiphong Harbor and other coastal and inland waterways in North Vietnam between February to July 1973), his service records do not reflect that he served in Vietnam or that the USS Henderson entered the 12-mile territorial sea of Vietnam during the Veteran’s service onboard. See October 2005 VA treatment record; December 2014 congressional inquiry report; April 2016 statement; December 2018 hearing transcript. As such, he did not have service in a location that provides for a presumption that he was exposed to herbicide.

The Veteran reports that he was exposed to herbicides while stationed on Guam. The Veteran’s service records show that he served as a radioman in the receiver division at a Naval Communications Station on Guam from April 1974 to April 1977. See service personnel records (SPRs) dated December 1974, December 1975, December 1976, and December 1977. 

As noted above, the Veteran reported in an April 2016 statement that he worked at a receiver site adjacent to the runway where the Air Force sprayed Agent Orange on the runways, antennas, and perimeter fences. In support of his assertions, he submitted copies of articles, research, and legislative documents that indicate herbicides may have been stored and/or used on Guam during the time that he served there. Specifically, in a copy of 2019 Legislative Resolution 71-35 (COR) retired Air Force Master Sergeant LF testified that he “prepared, mixed and sprayed on Andersen AFB, Guam and all off base facilities, cross country pipelines that spanned the island to the Naval Fuel Supply Depot underground storage tanks.” He used a five-ton blue tract or truck and a yellow 750-gallon tank trailer which was an old MK-1 oil and Adi trailer to service C-124 Globemaster Aircraft which was converted into an herbicide spraying trailer. He often would have to spray the entire pipelines, hydrant pump stations on the flight line, the Quonset huts storing the packaged oil for the B-52 bombers, the fuel valve pits, the security fences surrounding the flight line, the fuel storage facilities at Andy I, Andy II, the Liquid Oxygen building. the Fuel operations office, the truck refueling hardstands, the refueling fleet checkout area, all of the off-base fuel storage facilities at Potts tank farm, Naval Air Station Fuel Booster pump station, Tumon Tank Farm and the entire cross-country pipeline.

A September 2013 article reported that in sworn testimony to the U.S. Congress and several affidavits retired Air Force Master Sergeant LF, who served as a Fuel Specialist at Andersen Air Force Base (AFB), Guam, from September 1968 until June 1978, maintained that Agent Orange, which contains deadly TCDI dioxin, was among the defoliants he regularly mixed and loaded into his trailer-mounted sprayer and dispersed base wide; the official measurement made by the Agency for Toxic Substances and Disease Registry in a 2002 Public Health Report put the dioxin soil contamination at Andersen AFB at an astronomical 19,000 ppm (parts per million); and the Environmental Protection Agency (EPA) put Anderson AFB on the list of Superfund sites, noting area was vastly contaminated with dioxins, pesticides, trichlorethylene and other soil and water toxins.

In a November 2009 statement, retired Air Force Master Sergeant EJ reported that he served at Anderson AFB, Guam from 1972 to 1973 during which he occasionally transported 55 gallon drums of Agent Orange used to spray weeds and brush on the ramps, taxiways, revetments, runways, and other areas of Anderson AFB and at various U.S. Navy bases on Guam, including Naval magazine, Naval Communications Station, Naval Air station, and Navy Harbor area.

At the December 2018 board hearing, the Veteran’s representative cited a U.S. Government Accountability Office (GAO) report that acknowledges that Agent Orange components 2, 4-D and 2, 4, 5-T were used on Guam in commercial herbicides. Indeed, the November 2018 GAO report notes that “available records show that DOD stored and used commercial herbicides on Guam, possibly including those containing n-butyl 2,4,5-T, during the 1960s and 1970s, but documents do not indicate the use of tactical herbicides on Guam. Commercial herbicides were available through the federal supply system for use on U.S. military installations worldwide.” See GAO-19-24. “A detailed 1968 report by the Naval Supply Depot states that the Public Works Center sprayed herbicides semi-annually to control the vegetation along fuel pipelines between the depot and Andersen Air Force Basse. Id.

“Additionally, draft environmental assessments written in 1999 and 2009 by Naval Facilities Engineering Command, Pacific, indicate that commercial herbicides containing 2,4-D were present on Guam, and that commercial herbicides containing 2,4,5-T, which included the contaminant 2,3,7,8-TCDD, had been used for weed control along power lines and substations through 1980. Further, a 1969 master storage plan for the Naval Supply Depot includes sketches of storage facilities that specify the location of weed killers. Commercial herbicides approved for DOD procurement for use on installations were issued in 55-gallon drums and 5-gallon containers during the Vietnam War era, as were a range of other products, such as fuel oil and diesel. According to DOD officials, records for such purchases were not typically retained due to short record retention policies related to such routine supply transactions.” Id. 

In this case, the assembled service records and documents adequately corroborate the Veteran’s service in Guam. VA regulations and GAO research, with consultation with other government records, has not resulted in a finding that tactical herbicides were used or stored at U.S. military sites on Guam. However, the GAO report conceded that available records show that DOD stored and used commercial herbicides on Guam, possibly including those containing n-butyl 2,4,5-T; and draft environmental assessments written in 1999 and 2009 by Naval Facilities Engineering Command, Pacific, indicate that commercial herbicides containing 2,4-D were present on Guam, and that commercial herbicides containing 2,4,5-T, which included the contaminant 2,3,7,8-TCDD, had been used for weed control along power lines and substations through 1980. Moreover, a statement from retired Air Force Master Sergeant LF stated he regularly mixed and loaded defoliants into his trailer-mounted sprayer and dispersed them base wide from September 1968 to June 1978, a period of time during which the Veteran was also stationed at Naval Communications Station on Andersen AFB, Guam. The evidence does not support a likelihood that service in Guam generally included exposure to herbicides containing dioxin, but the evidence supports a significant possibility that such herbicides were used for groundskeeping. That is essentially the means of exposure the Veteran reported, so the evidence makes his exposure claim plausible. His accounts are consistent and detailed, which adds to their credibility. As such, resolving reasonable doubt in the Veteran’s favor, the Board finds that he was exposed to herbicides containing components 2,4-D and 2,4,5-T while serving in Guam and that his type II diabetes can be presumed to be related to herbicide exposure in service. 38 U.S.C. § 5107(b); 38 C.F.R. § 3.102; Gilbert v. Derwinski, 1 Vet. App. 49, 53-56 (1990).

REASONS FOR REMAND

1. Entitlement to service connection for bilateral plantar fasciitis is remanded.

The veteran contends his bilateral plantar fasciitis is related his active service. Specifically, he asserts that his disability is related to several severely sprained ankles (both feet) that he incurred in 1973 or 74 aboard the USS Henderson and in Guam as well as because his job as a radioman required him “to stand on concrete all the time.” See December 2018 hearing transcript. In this regard, the Board notes that the Veteran is service connected for a left ankle sprain. The November 2014 VA examiner opined that the Veteran’s bilateral plantar fasciitis was less likely than not incurred in service. However, the opinion is primarily based on an absence of evidence and does not address aggravation. As such, remand for a new opinion is warranted. Moreover, VA treatment records show the Veteran has received private treatment from a podiatrist in Oak Harbor, Washington. See VA treatment records December 2015, July 2016, and May 2017. However, it does not appear these records have been associated with the file. As such, on remand the AOJ should attempt to obtain these records

2. Entitlement to service connection for liver disease is remanded.

The Board notes that a VA examination is needed as one has not been provided. The Veteran contends that his liver disease is related to his active service, to include in-service exposure to herbicides and Hepatitis B while stationed in the Philippines and in Guam; and that his liver disease is secondary to his now service-connected diabetes, to include medications prescribed for his diabetes. See April 2016 correspondence; VA Form 9 dated April 2016 and May 2016 Form 9; December 2018 hearing transcript. In this regard, service treatment records (STRs) show providers noted the Veteran had a rash all over his body and on his torso in November 1975 and on his legs in September 1979; had swelling in his legs in April 1977; complained of experiencing diarrhea and nausea in February 1977 and October 1978; and was prescribed Lasix in April 1976 and January 1978. Post-service records show elevated liver enzymes since October 2005 and a diagnosis of Hepatitis B in October 2011. Moreover, as noted above, the Veteran has been service-connected for diabetes. See VA treatment records dated October 2005, September 2011, October 2011, August 2012, August 2013, and October 2015. Moreover, in support of his assertion that his liver disease is caused by his now service-connected diabetes he submitted medical research from 1999 and 2007 that indicates diabetes may be related to liver disease. See April 2016 correspondence. As such, a VA examination is warranted. See McLendon v. Nicholson, 20 Vet. App. 79, 81 (2006)

3. Entitlement to an increased initial evaluation for asbestosis is remanded.

The Veteran is seeking entitlement to higher initial evaluations for his service-connected asbestosis and residual gluteal cleft scar. The Veteran’s most recent VA examination for his asbestosis occurred in February 2016. Since that time, the record reflects that at the December 2018 Board hearing the Veteran asserted that his disability has worsened, to include increased difficulty breathing and coughing; and in a May 2016 statement reported that nail deterioration, to include tearing and bleeding. These are the first such contentions by the Veteran and the Board finds that they raise a possibility that the disability may have worsened. Therefore, a new VA examination is needed. See Snuffer v. Gober, 10 Vet. App. 400, 403 (1997).

4. Entitlement to an increased initial evaluation for a residual gluteal cleft scar is remanded.

The Veteran’s most recent VA examination for his scar occurred in February 2016. Since that time, the record reflects that at the December 2018 Board hearing the Veteran asserted that his disability has worsened, to include that it has become unstable and “grew six inches” and “tends to get infected.” Moreover, a November 2018 VA treatment record shows a dermatologist noted that the Veteran’s scar has become more symptomatic and referred him for consideration of scar revision. These are the first such contentions by the Veteran and the Board finds that they raise a possibility that the disability may have worsened. Therefore, a new VA examination is needed. See Snuffer v. Gober, 10 Vet. App. 400, 403 (1997).

The matters are REMANDED for the following action:

1. The AOJ should obtain copies of VA treatment records for the Veteran’s disabilities from February 2019 to the present.

2. The AOJ should obtain, if possible, records of all private evaluations and treatment the Veteran has received for his feet. The Veteran must assist in the matter by identifying his private healthcare providers and by submitting releases for VA to obtain any private records identified.

If any private records identified are not received pursuant to the AOJ’s request, the Veteran should be so notified and advised that it is ultimately his responsibility to ensure that any available private records are received.

3. After the above development is completed, the AOJ should arrange for a VA examination of the Veteran to determine the nature and likely cause of his plantar fasciitis. The examiner should review the claim file (including this remand) and note such review was conducted. Based on review of the record and examination of the Veteran, the examiner should provide an opinion with detailed rationale that responds to the following:

(a.) Please opine as to whether it is at least as likely as not (50% or greater probability) that the Veteran’s plantar fasciitis was either caused or aggravated by the Veteran’s service-connected left ankle sprain? Please explain why. In doing so, the examiner should address the Veteran’s statements that his plantar fasciitis was caused by severely sprained ankles that he incurred in 1973 or 1974. 

The opinion must also address whether the disability increased in severity beyond its natural progression (i.e., was aggravated). If aggravation is found, please identify to the extent possible the baseline level of disability prior to the aggravation.

(b.) Please opine as to whether it is it at least as likely as not (50% or greater probability) that the Veteran’s planta fasciitis was either incurred in or otherwise related to the Veteran’s active duty service? Please explain why. In doing so, the examiner should address the Veteran’s statements that his plantar fasciitis was caused by stand on concrete all the time during active service.

4. After the development in (1) above is completed, the AOJ should arrange for a VA examination of the Veteran to determine the nature and likely cause of any liver disease. The examiner should review the claim file (including this remand) and note such review was conducted. Based on review of the record and examination of the Veteran, the examiner should provide an opinion with detailed rationale that responds to the following:

(a.) Please identify, by diagnosis, all liver disabilities present during the appeal period (from April 2014). In doing so, it should be noted that the record contains a diagnosis of Hepatitis B, and thus, the opinion should include consideration of this diagnosis.

(b.) For any liver disability diagnosed, is it at least as likely as not (50% or greater probability) that the disability was either caused or aggravated by the Veteran’s service-connected diabetes to include medication prescribed for the same? Please explain why. In doing so, the examiner should address the medical research submitted by the Veteran indicating an association between liver disease and diabetes.

The opinion must also address whether the disability increased in severity beyond its natural progression (i.e., was aggravated). If aggravation is found, please identify to the extent possible the baseline level of disability prior to the aggravation.

(c.) For any liver disability diagnosed, is it at least as likely as not (50% or greater probability) that the disability was either incurred in or otherwise related to the Veteran’s active duty service, to include by exposure to herbicide agents and/or Hepatitis B in the Philippines and/or Guam? Please explain why. In doing so, the examiner should address the in-service Lasix prescription, treatment of a rash, diarrhea, and nausea; post-service elevated liver enzymes levels.

5. After the development in (1) above is completed, the AOJ should arrange for an examination of the Veteran to assess the current severity of his service-connected asbestosis. The examiner must review the entire record (including this remand) in conjunction with the examination and note such review was conducted. The examiner should provide a full description of the disability and report all signs and symptoms associated with the Veteran’s disability.

6. After the development in (1) above is completed, the AOJ should arrange for an examination of the Veteran to assess the current severity of his service-connected residual gluteal cleft scar. The examiner must review the entire record (including this remand) in conjunction with the examination and note such review was conducted. The examiner should provide a full description of the disability and report all signs and symptoms associated with the Veteran’s disability.

7. If upon completion of the above action the issues remain denied, the case should be returned to the Board after compliance with appellate procedures.

 

E. I. VELEZ

Veterans Law Judge

Board of Veterans’ Appeals

ATTORNEY FOR THE BOARD A. Roe, Associate Counsel

The Board’s decision in this case is binding only with respect to the instant matter decided. This decision is not precedential, and does not establish VA policies or interpretations of general applicability. 38 C.F.R. § 20.1303.